Good morning, Mr. Goode. Good morning, Your Honor. May it please the court, counsel. Your Honors, my name is Colin Goode. I am representing the plaintiff appellant, Dr. Michael Simpson, who is in attendance today. Plaintiffs asserts that the district courts were granting summary judgment to the defendant should be reversed for the following three reasons. First, the district court improperly the evidence indirect, or excuse me, direct evidence, as well as circumstantial evidence, the defendant based its decision to reject or threatened to reject his application for medical privileges based on his race. Let me just ask you this. I mean, I gather that the licensing board's decision to require an oral examination struck the committee members as being highly unusual. I mean, now, wouldn't a conscientious employer want to track down the reason why the board insisted on something that really looks like an unusual step? Well, Your Honor, as it relates to the requirement for plaintiff to sit for an oral exam prior to receiving his unrestricted licensure, he received the unrestricted licensure the next day. We know that. That doesn't factor in here. It's what, you know, why wouldn't they wonder? Well, I guess I would also then go towards the de novo review. This court needs to draw all inferences on behalf of the plaintiff appellant. The defendant's subjective concerns regarding his need to sit for an oral exam should not be credited. And, in fact, on the phone call prior to the day that Mr. Simpson, Dr. Simpson, withdrew his application for medical privileges, Dr. Eric Miller, who is an ex officio member of the Credentials Committee and a voting member, the chair, in fact, of the Medical Executive Committee, doesn't mention in the three-page typewritten explanation provided by defendant as that being a source. That is to say that the oral exam was not a source of concerns during the conversation 24 hours before the Credentials Committee was set to potentially reject his application. So you wouldn't think that that was a red flag? Considering that Dr. Simpson received the licensure the next day and it was two other states' certifications that he was holding unrestricted licensure, would not give me pause. But then again, I would say that under the standard of review, any type of reasonable inference in favor of the non-moving party, in this case Dr. Simpson, should not be resolved by a court. Instead, it should be resolved by a jury. These were jury questions and credibility determinations, which under the U.S. Supreme Court's holdings in both Reeves and Liberty lobby, really make it an issue for a jury to decide. However, that was not the only circumstantial evidence that the District Court ignored in reaching its conclusion that summary judgment was warranted for the defendant. The District Court also disregarded inferences properly drawn from Dr. Eric Miller's statements the day before the Credentials Committee was set to reject Dr. Simpson's application for medical privileges. This is the type of circumstantial evidence that this court has consistently cited to... that there is a negative inference from comments like they would expect an applicant to be on their best behavior and he should find a place where he's a good fit. That's... I just, I don't see it. How do you get there? Sure. Well, given the context, Dr. Eric Miller called 24 hours before the Credentials Committee was set and told the plaintiff here, Dr. Simpson, that it they were going to reject it. In fact, the M.E., that they were going to do so. The rationale behind whether it's a better fit and whether that draws an inference of... that it's discriminatory based, we've cited to both the Abrams and Patrick Ridge, both the Second and the Fifth Circuit, indicating that this type of better fit language is... maybe doesn't speak directly to an inference. It's not an admission by the employer that they're taking an action, a negative action, because of... You'd like to have physicians who are a good fit with the practice, who are a good fit with the hospital philosophy. You would like to have physicians that act on their best behavior when they're around staff or others, patients especially. What... how does that become racial? I just, I can't see that. Well, it's the inference. A better fit is... could be that he doesn't work well with colleagues, but it also could be that he doesn't work well with... or that, excuse me, that he... the first inference is that he isn't going to be a good fit. But why is he not a good fit? And it could be a not a good fit because of his inclusion in a protected class. Now... So let's say Miller had said, we only want the best doctors. We should infer that means we only want Caucasian doctors. How... I just don't see how you... I think you stretch too much for those inferences. Sure. I think your direct case is non-existent. Well, Your Honor, again it's the inference that it raises, and it's our argument that the district court shouldn't have resolved, and this court need not resolve whether that type of inference, being reasonable as we believe it is, as so too does the Second and the Fifth Circuit, is potentially about plaintiff's race and potentially speaks to the reasons why the defendant was going to reject his application for medical privileges. In fact, it does appear, and it's not credited in the district court's opinion, that beginning in March, Dr. Kimberly Miller, who... or excuse me, Ms. Kimberly Miller, who's the chief executive officer of Beaverdam Community Hospital, wrote an email in which she said, and specifically in reference to Dr. Simpson, if they are not upfront with us about all outstanding items, then we need not... we need to have a clause to exit the discussions without any issue if we decide to, and then a number of ellipses, at the point that we discover something. It appears that they were always going to go fishing for some reason to reject Dr. Simpson. An issue and a statement such as whether he was... could be a better fit elsewhere, coupled with the context of the conversation. This took place during a conversation in which Dr. Eric Miller was explaining to Dr. Simpson the reasons why they didn't believe that he was supposedly unqualified for his position. This was a conversation that ostensibly ended his potential for employment. It was at the time the comments were made, both as it relates to his qualifications, but then also telling him that he wasn't qualified enough. And so for that reason, it appears that, at least from our perspective, that it suggests a prohibited racial inferences. This also then speaks to some of the other circumstantial evidence, so not only ambiguous oral written statements... Once more, you're in your rebuttal time. Great. I'll just finish this one particular place and then reserve it. Thank you, Your Honor. The other circumstantial evidence spoke specifically to that he had been replaced by a similarly situated employee, and that, in fact, other white Thank you very much. Mr. Costello, good morning. Good morning. May it please the Court, my name is Tim Costello. I'm here representing the Appellee Beaver Dam Community Hospitals, located in Beaver Dam, Wisconsin. What do we do with the factual dispute about how Dr. Simpson behaved with respect to the signing bonus? Does the record tell us how that incident was reported to members of the Credentials Committee? Yes, Kim Miller was involved in that, directly involved in that incident, and she sits as a non-voting member on the Credential Committee and was in attendance at the September 24th meeting and in contact. I think there's a statement in Dr. Eric Miller's declaration that he consulted with Dr. Joel Miller and Kim Miller before he called. Dr. Eric Miller called Dr. Simpson on October 12th. Are they all related? No, but we tried to get... I know one pair isn't, but somewhere in there? No, none of them are related. Obviously, it's a common name in Beaver Dam, Wisconsin. I just want to speak to a couple points. Unlike some of the summary judgment cases that the Court sees on employment discrimination, there really is no dispute at all on the factual underpinnings of the need that Dr. Simpson had to take an oral exam, and he was the only one that the Credential Committee had experienced in that regard. Was the hospital, as a prospective employer, not able to ask the State Licensing Board directly why it was insisting on this oral exam? Shortly after the September 24th meeting where they tabled his application, they wrote the Wisconsin Licensing Board, as well as wrote Dr. Simpson, for an explanation as to why there was the need to take an oral exam, and Wisconsin never responded to us. Not to this day? Not to this day. The other criteria or element that was looked at by the committee was the fact that Dr. Simpson had to be placed on academic probation during his residency. Again, no dispute that that fact happened, in addition to the two uninsured malpractice claims that were pending at the time of his application, and no dispute that they were pending that he was a defendant and he was uninsured for those claims. And then there's no dispute about the negative reference we received from a prior employer. All those things, there's some evidentiary objections based on hearsay, but it's offered not for the truth of the matter asserted, but the state of mind of the Credential Committee Chair. All that stuff is there. The real dispute is, well, gee, Credential Committee people, you shouldn't evaluate it the way you do. You should take my explanation and accept it. And if you look at the bylaws carefully, the bylaws say, here's the minimum stuff we're looking for to be eligible to apply for credentials at our hospital and practice medicine. And beyond that, then it's a sifting process. And what's that sifting process for? Judge Dinder says, to see whether you're a good fit. It's the conclusion of the process. And if you look at the Abrams case and the Patrick case, the Second and Fifth Circuit cases, those cases was where the employee asked, why didn't I get picked? Why didn't I get hired? And there was a short but sweet, you weren't sufficiently suited. You didn't fit in. That's nowhere near the case in our case. There was all this interaction, buildup, exchange of information. Dr. Eric Miller took the time to call Dr. Simpson and spend 45 minutes on the phone with him and explaining to him. Didn't they pay $12,000? Yes. The other interesting fact in the case is Kim Miller, the CEO, made the decision to offer him an employment contract, which is a three-year employment contract, by the way, that modifies the at-will doctrine, and obviously knew his race when she offered the job to him and paid the $12,000, authorized the $12,000 recruiting fee to find this candidate. And then it's a two-channel process. It's the employment process that you meet with administrative people. So this recruitment service didn't come up with any of this? Is that what you're saying? No, it shifts over. Once the employment end of it is finalized, then it shifts over to the credential process, which is an independent, separate committee in the hospital. What were they investigating? I mean, what were you paying them $12,000 for? Just to find the candidate. Really? Finder's fee. A recruiting fee. Yeah. They call them headhunters, but they don't like to be called headhunters. They're recruiters. And they provide resumes, they do some preliminary checking in terms of matching the candidate's qualifications with your needs. Who hires the headhunter, you or them? We pay for the headhunter. The headhunter, he goes and they go look for recruiters. Right, right. So they select the candidate, you pay them. Yeah, if we end up hiring the candidate, yes. And we paid the $12,000, and we didn't get a refund for it. There are no medical schools near Beaver Creek, and you don't have a population of doctors that are coming and going from there. Right, right. And as you can see from the hiring of Dr. Flood and the other individuals they cite as comparators, we're expanding and, therefore, they need to go out and recruit out-of-state physicians where you have to, under the health. Are there minority physicians on staff? Yes, yes. And this peer review process, or they call it professional review process that's contained in the bylaws. The bylaws are a term that Dr. Simpson agreed to in his employment contract. He agreed that that was the way we were going to handle credentials. And by withdrawing his application, he short-circuited the process. It's a little ironic that they kind of critique this phone call that we have and try to give him a heads-up before we put something in writing. We were trying to do him a favor. But it's kind of like he did it to himself. He didn't want to go through with the process because if he went. No good deed ever goes unpunished. Right, and if he had gone through the process, he would have been able to appear before the next tribunal. He would have had written reasons, and he would have gone through the whole process, and it might have been changed. But we don't know. So one of the arguments that this report. Well, I mean, for summary judgment purposes, why wouldn't that be treated as an adverse employment decision? I mean, given that he was warned that the result was likely to be negative, and that negative decision would in turn have to be reported, couldn't that be treated as a constructive denial of his employment application? It could be in the normal employment case, but when you agree to the bylaws, you agree to the credential process through the Credential Committee, the Medical Executive Committee, and the Board of the hospital. That's the process. We cite a case that involved tenure of a college professor, and that's the process you agree to. If you pull your application, your request for tenure, there's no decision made. We have a non-decision here. Yes, we gave them a heads up. We said, hey, they're leaning this way, but you don't have a decision per the bylaws, which was agreed to by Dr. Simpson, until there's a vote, and there was no vote. It seems an awful lot like a constructive discharge to me, essentially saying if you don't quit, we'll fire you. But it's a hiring case. If you don't withdraw your application, we'll reject it. But it's from a person that has no vote on the committee, and I agree. Traditionally, in a traditional hiring context, I would agree with that, but I think this is a little different because of the bylaws come into play, and that was the process he agreed to. The only other comment I'd like to make was the fact that we talked a little bit about good fit, bad fit, or best behavior. The appellant agrees in their brief that that is not evidence directly of a race-based decision. As I mentioned, the whole vetting process, whether it's for employment or credentials, that's what the purpose of the process is, to see whether they're going to fit in under the multiple qualifications and requirements of the job. The one negative reference we got from a former employer of Dr. Simpson was somebody that he didn't list, or the ones he listed were colleagues that he worked with in terms of other professional colleagues. I think Judge Crabb mentioned that's pretty typical. An employee only will list the reference, or an applicant only lists the reference that they're going to get to say something positive about them. Under the Health Care Quality Improvement Act, this professional review process is designed for us to allow us and give us some immunity to get into the nitty-gritty and find out all the information you need before you license a doctor and credential a doctor at a hospital. That's all I have unless there's any further questions. Thank you. Mr. Goode, two minutes. Thank you, Your Honor. Your Honor, as it relates directly to whether an adverse employment action took place, we'd note at the outset that there does seem to be a difference of opinion whether, in fact, my client suffered an adverse employment action. The Court should take note that Plaintiff, after he withdrew his application, emailed to the CEO, Kimberly Miller, and requested that she consider the contract active and binding. Now, he did so because he said the only reason why he would withdraw it was because Dr. Eric Miller had said that his application for medical privileges was going to be rejected. So at the very least, there is some dispute whether an adverse employment action took place. This Court has said previously that it need not reach that issue, however, if the employer has advanced evidence of a legitimate nondiscriminatory business reason. One of the factors that we've been talking about so far has been whether the negative reference also played a role in the defendant's rejection of Dr. Simpson. Specifically, we have contested that that is a hearsay statement, but it's worth repeating that the type of credibility determination at issue there, whether, in fact, he was qualified, is not properly before this Court and need not be resolved by the Court. It's an issue for the jury to resolve. As it relates to the medical malpractice and the recruiter, the medical malpractice was information that the employer had since he submitted his application six months prior to the rejection or threatened rejection of his application. Similarly, the academic probation on which he was placed ten years earlier doesn't speak to the defendant's bylaws, and specifically whether his current medical competency was such that he wasn't qualified. I think it's also worth restating again, as it relates to the better fit comments, is that the inference here is that it could have been about race. Certainly, it can speak towards whether he was going to be a good fit, but a better fit argument is was he a better fit because he could have been or was he rejected because he was black, and that was the reason why he was rejected. As such, we request that this Court reverse the grants of summary judgment and remand for a trial on the merits. Thank you very much. Thank you very much. Thanks to both parties. And the case will be taken under advisement.